I please the Court, Charlotte Costin for the appellant John Sutter, and I would like to reserve five minutes for rebuttal. We are bringing you another instructional problem. This time the instructional error is the fact that the district judge gave instructions dealing with common law of agency instead of instructions that were tailored to the FILA, drawn primarily from Bountiful Brick. In Bountiful Brick, the Court gave several criteria which involved how long and under what circumstances a person remained within the scope of his employment after he punched out, after he was off the clock. Bountiful Brick was a workers' comp case, which is even more restrictive. It's a case that's far more restrictive than the FILA. Since 1917, in Erie v. Winfield, the courts have said that the FILA law has to be interpreted liberally in order to affect the purpose of the FILA. Thus, the scope of agency, or the scope of employment, rather, in a FILA case is far broader than that with the common law of agency. Kagan, can you just focus in now on the instruction that was given? What was the jury precluded from considering that it would have considered if appropriate instruction had been given under FILA? Well, first of all, the instruction was narrow, only if. So, for example, A said it is a the conduct of a servant is within the scope of his employment if it is of the kind he is employed to perform. When you look at that phrase, Sutter was not employed to commute to his home in Nevada. He was employed to be a conductor. So right there, you have the jury saying, oh, well, he wasn't hired to commute home. On the other hand, a standard instruction would have said something like, is this incidental to his employment? Did he confer a benefit on the employer by commuting by commuting? Did he, was he available to be on call or on an as-needed basis? None of that is provided in the instruction that the Court gave. Then the Court goes on to say, only if it occurs substantially within the authorized time and space limits. Well, again, that is, that is narrower than you would find in a case like Bountiful Brick. So what you're saying is that the jury, do you agree that the jury, it was appropriate jury in question as to whether or not at the time that this injury occurred, he was within the course and scope of his employment? That is, yes. That is. And do you agree that a critical, that the fact that he is, was, was on his way to or from his employment is a part of that? Is that a jury, whether that's within the scope of his employment, is that a jury issue as well? Yes, I think it is. And there's always, going back to the Moston case, Loudon and others even back further in history, a reasonable time and distance going to and from work falls within the scope of a FILA. But it doesn't fall within the scope of a common law of agency. And I think that's where the problem is. So the jury was not, just let me, so the jury was not permitted to decide whether his trip back home was within the scope of his, of course, the scope of his employment, is that? Within the meaning of the FILA. Within the meaning of the FILA. Yes. Did your position that the trip from Salt Lake City to Nevada could be a reason, within a reasonable time and distance of his employment? Yes, I think so. And how is that? How many miles was the wreck from where the departure, where he got on the train? I don't know how many miles it was, but it was about four hours. In other words, he boarded the train shortly after midnight. I'm not sure what time the train left. Further away than that. It's about 700 or 800 miles, isn't it? About a seven or eight-hour train ride? I thought it was longer than that even. Oh, the point of the accident, yes. But I think the question was to Reno. As long as he is either on call, which he would have been available for call in another three hours, or he is available to handle an emergency as a trained conductor, then, yes, I think that there should not be an arbitrary limit of 10 miles or 20 miles or 100 miles, as long as he is there to perform the work of his employer if a need arises. Or at least the jury should have been able to consider that? Yes. Yes, I think so. Was there ever a request? I don't have entire records, so I don't know the answer to this. Was there ever a request for a special verdict on where Holm was? No. No, not to me, because that was another issue and dispute, of course. The railroad claimed his home was in Salt Lake City because he had a truck and a trailer there. Well, yes, apart from that, I mean, your duty station is Salt Lake City. Yes. So he ñ your argument is that he's commuting to Reno in order to get to his work in Salt Lake City. No. No. He's commuting to Reno to go home after his shift ended, but he is still available to benefit the railroad in case there is a need. That just doesn't ñ you know, it doesn't make a lot of sense. In what respect, Your Honor? Well, people don't ñ I mean, why should the railroad at all be responsible on a commuting theory for someone whose workstation is Salt Lake City and who goes home, in quotes, to Reno and then back to Salt Lake City? I assume the same would be true in reverse. That is, when he gets on the next morning or the next ñ I mean, 36 hours later in Reno, he's going to be on the employer's hook, right, until he gets to Salt Lake City? I think that's the thrust of the cases. And, you know, one of the ñ Well, I don't see that that is. I'm not quarreling with the notion that you had something to go to the jury, but I'm just trying to tease out of you what your real theory is, because the commute aspect seems kind of tough to accept. But he was doing it with the encouragement of his employer, of the railroad. He was doing it knowing that he would be available for service if they needed him, and he was doing it if he needed ñ All of those things would be true if he had decided to go to Miami to play on South Beach, right? I don't think so. I think there is a distinction for people ñ for employees who use a pass to go to their home because of the economic realities of the situation, or it's the only practical way to get there, and somebody who goes off to Miami on a pleasure trip. Well, yeah, but if he chooses to live in Nevada, which is 800-some-odd miles away from his duty station ñ But there were other employees who did the same thing with the approval of the railroad. This is fairly common, isn't it, if you work on a railroad or an airplane or something like that, that you ñ Is it common to live 800 miles away? Yes, it is, Your Honor, because of the nature of the railroad business itself and the nature of travel business itself. It's ñ there were at least ñ the evidence of trial established there were at least three other conductors who did this just on the route between Salt Lake City and Nevada. And so I think if you look at Justice Black's comments in one of the cases ñ I can't remember which one right now ñ he says this is a traditional aspect of being employed by the railroad. I don't quarrel with that, but the cases are like, you know, if you live in Newark and you go into Manhattan or Newark in Philadelphia or 8 miles away from the tower where you work. I mean, they're all things that make sense. I mean, the notion of commuting 700 or 800 miles is odd. Your Honor, there are marriages where one person lives on the west coast and one on the east, and they commute. I don't ñ I understand. And normally, both spouses know that. Well, and the railroad ñ It's not clear to me that the railroad knew this. The supervisor knew this. He didn't. Completely. Yes. Let me ask you this. All the argument so far has been, and properly so, on the issue of the jury instruction at trial. But you also have an issue about the common law negligence claim being dismissed. Exactly. Before trial. And what I wanted to know relating to that was it seems like the Boren case, the Supreme Court decision in Boren is ñ supports what the trial court did, but is that ñ what's your position on that? In other words, the Boren ñ did the Boren case ñ I don't believe it involved a commuting railroad employee who was traveling to and from work. No. But doesn't it indicate that a person who travels on a free pass is presumed to know the conditions of it? That's my concern with that case. I don't ñ it didn't seem to me like a very traditional application of assumption of risk doctrine, but yet it's the Supreme Court and it's sitting there since the 1890s. But there are subsequent cases, too, which, you know, in ñ which after the Hepburn Act, in which the legislative history suggests that railroads are a free pass given to a railroad employee makes him a passenger for hire instead of ñ he's not a gratuitous traveler the way his wife, who goes on a trip, might be, or if he's going on a vacation and using the free pass for that purpose. How do you get around Francis? Francis is not easy to get around. I know. That's why I'm asking how you get around it. I think, again, the fact that he's ñ that there is some dispute as to whether Francis adequately represents the state of the law. These cases are also old. No, but that's U.S. Supreme Court law. And even if we might quarrel with its wisdom or its currency in today's world, it is something we're obliged to follow. And then you can take it upstairs and have them, you know, redo their own law. I think the distinction has to be that in Francis, the railroad employee ñ and I may be wrong now. I've read so many cases ñ was not commuting on the way to work, was on a trip of his own. And, again, I'm sorry, Your Honor, but the details of that case have escaped me as to whether he was within ñ whether there was an argument that he was traveling on, you know, on a free pass. Was there an argument that ñ did he know about the ñ about the non-liability clause? I don't remember that either. I'm sorry. I feel like I've kind of ñ Maybe get back to it to ñ Yeah. You have some time on rebuttal. All right. I will do that. Again, in ñ in going back to the first issue, if the trial judge had given either the badgery instructions that had to do with FILA or if he'd given the new instruction, the CACI instruction that dealt with ñ that was more ñ much broader and is in the alternative, I think the jury could reasonably have concluded that because Mr. Sutter did convey a benefit on the railroad, I mean, after all, this guy was a hero. I mean, he saved the railroad a lot of money, and that is one of the aspects of ñ of his commute, is to be available to render that kind of service. CACI says, ìConduct is within the scope of employment if it is reasonably related to the kind of task that the employee was hired to perform. Again, he was on duty in terms of an emergency basis when the railroad, through its negligence, went too far into a freight train and caused a derail. The other aspect of CACI is whether it is reasonably foreseeable in light of the employer's business or the jobís ñ or the employeeís job responsibilities to be in the place where he was when the derail occurred. And again, it appears to me that this is a much broader expression of jury instructions that would allow the jury to come to a totally different conclusion. And so it is the instructional error that we really feel deprived Mr. Sutter of his benefits under the FILA because it was so narrow it wiped out his rights. I have five and a half minutes left. Thank you. MR. SAVAGE. Good morning. My name is Scott Savage. I represent Amtrak, the appellee in this case. The facts that bring us here today were never in dispute. Mr. Sutter reported for duty in Salt Lake City and went off duty in Salt Lake City. He had to be on call to be available when called within two hours. Because of that, he had a home in Salt Lake City, a trailer in Salt Lake City, and he had a trailer in Carson City. He kept horses in Carson City. He had worked a trip ñ conductors donít work shifts, they work trips. He worked a trip from Salt Lake City to Grand Junction, came back from Grand Junction to Salt Lake City. My recollection is the train was in about 3 a.m. in the morning or shortly before then, left about 3 a.m., to proceed on to Reno. Now, hereís the key fact. Mr. Sutter testified he was off duty, not being paid, 20 minutes after the train arrived in Salt Lake City. And even more key, he then took his luggage off the train and put it in his truck that was parked in the parking lot at the station in Salt Lake City. Presumably at that point in time, he would have finished his commute, if weíre looking at this as a commuter case, by driving back to his trailer in Salt Lake City. Instead, he decided to go check with the dispatcher and see how many days off he would have coming because he is on a rotation board. And he has now finished the trip, he goes from the top of the board to the bottom. Now, everybody above him has to be called and work a shift or a trip before he gets called again or violates the collective bargaining agreement. He therefore can tell by how many people are ahead of him about how many days off heís going to have. He determined he had enough time off to go to his home in Carson City. He was going there to spend some leisure time. He was taking days off. This isó Donít youó The difficulty, it seems to me, though, is that if the jury is not properly instructed and if the instruction constrains their consideration, indeed, as I would believe of just what youíve just argued, then doesnít it have to go back? Not if you determine as a matter of law that he was not within the scope of his employment. We had filed a motion for directed verdict that was denied without prejudice to us raising a JNOV. We didnít have to do that because we had a verdict. Perhaps you could just spell out for me. I donít understand how the instructions came out the way they did. Okay. I mean, itís bizarre because neither party wished them. And CACI, if thatís the way itís now pronounced, itís been so long, I donít know. Anyway, 2926 actually dresses itself up as a FILA instruction. Yes, but itís not a FILA commuter instruction. I think it is more clearly designed for the situation of somebody leaving his particular post to do something else. The one thatís given isnít a commuter instruction. No, itís not. And we asked for a commuter instruction. Well, I mean, but your instruction was as erroneous in the district courtís view as were plaintiffsí modifical submissions, neither one having anything. I mean, hereís what the district court did. It took out ñ it took a vicarious liability-type instruction out of the restatement without giving its attendant factors instruction, which is the most restrictive possible view of scope of employment, to apply to an act where the law says itís supposed to be liberally construed. In response to your question, the Court at the ñ in ruling on the summary judgment, denying us our summary judgment on scope of employment, indicated to the parties that he was inclined to follow Bountiful Brick for jury instruction and invited the parties to reconsider the instructions they had previously submitted and each tailor a Bountiful Brick instruction. And both parties did that. Bountiful Brick, in my view, never was a relevant case. Number one, Bountiful Brick is not an FILA case. Itís a workmanís comp case. Number two, the issue in Bountiful Brick wasnít scope of employment in the sense of what you were doing. Itís a scope of employment that is ñ itís a famous case for extending the premises to beyond the actual ñ Whatís wrong with the CACI instruction? I think the CACI instruction is essentially the same as the one the Court gave.  The CACI instruction requires all three of the factors to be present. Okay. Okay. Thatís true. But under it, it also would ñ you know, is it reasonably related to the kinds of tasks he was sleeping on his way to leisure activity at the time this happened? He was ñ I didnít finish on the facts, but it follows with the instruction. He decides that after he has extra time, he goes and gets his luggage, puts it back on the train, goes in the sleeping car, and goes to sleep. Now, two very important factors also. It was illegal for him to work. As a matter of Federal law, he has to have eight hoursí rest. They could not call him back out to work if there was an emergency or for any other reason. There was testimony in the case that on one occasion that had happened and a union grievance had been filed because it also violates the union contract to call somebody out whoís now at the bottom of the list, and that grievance was still pending at the time of trial. So it was illegal as a matter of contract law, illegal as a matter of Federal law for him to be called back into service. And he was on his way to several days off at a place of his choice, and his employer didnít even know he was on the train. So put under that context, even the CACI instruction, reasonably related to the kinds of tasks that an employee was hired to perform, you know, he was sleeping on his way to leisure activity. Reasonably foreseeable in light of the employerís business or the employeeís job responsibility, he testified he never slept on the job, and it was not part of his duties. Well, are you effectively arguing that the judgment should be affirmed on the footing that your motion for directed verdict should have been granted? Thatís one reason, yes. I also think the instruction was proper. The instruction, after all, I mean, weíre talking about scope of employment, and the judge gives verbatim a statement from the restatement of agency. Well, yes, but without the attendant factors. I mean, he gives 228 without 229 or 229 without 228, whichever it is, that sheds light on it. This is the most restrictive scope of employment instruction that you could draft. Well, I think the one I drafted was much more restrictive. And really, that was following the cases. If you look, in our brief, thereís eight or ten cases. There is not a single commuter case under FELA where the employee was found within the scope of his employment, and several of them are as a matter of law. The employee is simply not within the scope of his employment while commuting, unless the employer tells him thatís the means he has to use, or itís otherwise reasonably necessary and incidental to his employment, which I think is what theyíre arguing here. But if you take an instruction from the actual language of the cases on FELA commuters, which CACI does not do or even come close to, you get the instruction that I presented to the judge when we withdrew our Bonneville Brick instruction. And he declined to give that one. Declined to give ñ they had about ten or eleven instructions by then, and went to the restatement of agency and came up with his own. I think that, A, I think the instruction is appropriate. I think under any instruction, the plaintiff loses on scope of employment in this case. And I think as a matter of law, he was not within the scope of his employment. He was on his way to be 5, 600, 700 miles from his place of employment when he has to be on call in two hours. He would have to, at some point in time, well in advance of when he would be called back, return to his home in Salt Lake City so he would be available to be on call. This doesnít fit in the Sassamon case. There are two cases that have tried to find that although they held theyíre not in the scope of their employment, that Sassamon and Metro Coal, Metropolitan Coal, although theyíre not within the scope of their employment, they found that it was an exception to the free pass for them to have been commuting. And it was not free because it was part of their employment. Well, if it was part of their employment, they were within the scope of their employment and they would have been covered by FELA. So the Sassamon and Metropolitan Coal cases are the only ones that support plaintiffís position. And even they donít support plaintiffís position on the commute being covered by FELA. There are no cases where a commute was covered by FELA. The plaintiffs are citing cases such as in Austin where theyíre at a work camp where the employer requires them to stay at a work camp. Itís a remote site. Theyíre on steel gangs. And there are several cases where if theyíre injured while off duty at a work camp where theyíre required to be, then itís covered by FELA. And there are, of course, the Traversing the Property cases, the cases that preceded Bountiful Brick. And then cases that, although I donít know any that actually apply Bountiful Brick, they pay lip service to it and say if the employee is Traversing the Property or even Traversing Adjacent Property to get to his place to work, he would be covered. But if theyíre commuting, there are no cases that are found. Well, but we donít see very many FELA cases anymore. Iíve cited several in the brief. I mean, theyíre, most of them are fairly old because theyíre As to the common, well, and once again, I think, you know, to wrap that up, the, I donít think under any instruction what he was doing would have fallen within the scope of employment, any reasonable instruction. The khaki one I find to be very brief and very dissatisfying. The common law case, thatís where the Sassaman Court and the Metropolitan Coal case found that the pass was not free as to an employee. That was contrary to U.S. Supreme Court holding, specifically, the Supreme Court history on this area is quite extensive. 1904, the Adams case, a lawyer, not an employee, fell off the train while riding on a free pass. Court held that the exculpatory clause in the free pass was binding, that he had accepted the free pass in return for agreeing not to claim any negligence in the event it occurred. The next case, the boring case, as Judge Gould pointed out, is a showstopper in this instance. In that case, the husband, not an employee, but a husband entitled to a free pass for he and his wife, obtained the free pass. She never saw it. She never saw the ticket. It was always in her husbandís possession. She had no knowledge of the exculpatory language that the pass was given in exchange for an agreement never to sue in the event of negligence. She was injured. The U.S. Supreme Court said it didnít matter. The duty is on the person who has the privilege, rides the free pass for free to find out the provisions. And thatís what the trial judge turned upon in deciding summary judgment in our favor on the common law claim. That case was followed by Charleston v. Thompson, Oliver Wendell Holmes. In that case, the argument was made, the same one as in Sassamon, where they said, but itís not really for free because itís part of the employment, and itís a perk, itís part of the employment package as to an employee. This was an employee case. Justice Holmes said no, even if it has something to do with the motivation of the person who goes to work, it is not a conventional type of remuneration in return for the services. They donít have to do anything more if they get it. They donít have to do anything less if they turn it down. The employer can withhold it if he wants, doesnít have to give it. And accordingly, it is just, in Justice Holmesí words, it is just what it says it is. Itís free. And if itís free, the exculpatory language is valid. The Hepburn Act was enacted. Van Sant was the next U.S. Supreme Court case. Could I ask you a question on that Justice Holmes opinion? Sure. How ñ if the language is on a ticket and somebody has the ticket, itís pretty easy. Itís one thing to say theyíre bound by it. If they donít have any knowledge of it, itís a little different. And boring seems to say, even though the wife didnít have any knowledge of the exculpatory language, she was bound by it. Right. And so I wanted to know if in the Holmes case, if thereís an issue of a person being bound by something that they didnít see. I donít recall that being in the case being talked about one way or the other, Judge Gould. I didnít either. And thatís whatís bothering me is this boring decision is troubling to me, but it seems like itís the Supreme Court. Yeah. And itís never been repudiated. And the courts ñ I can distinguish it. The court and Congress have both had opportunities. The Hepburn Act dealt specifically with these free passes. Apparently, congressmen were getting offered these free passes, and maybe some of them got better passes than others, but they decided to pass legislation outlawing the giving of free passes to anybody other than employees, family, and interestingly enough, drovers of livestock. They get free passes as part of the fare for the livestock, so you have somebody to take care of the animals on the train. But after Holmes decided, Van Sanden was after the Hepburn Act, the Hepburn Act did not address anything wrong with these exculpatory provisions, did not address Boringís decision by trying to change the law. And then you had Van Zandt where the state where the accident occurred had outlawed these kinds of exculpatory clauses. You could not agree it was against public policy to agree in advance to not sue somebody for negligence that hadnít occurred yet. It was also outlawed in the state where the trip began and the state where the plaintiff resided. But the U.S. Supreme Court said it doesnít matter, federal law preempts the state law in this field. What one was this? Van Zandt, 1923, and the Hepburn Act I think was around 1906 or ë07, something like that. But the Hepburn Act preempted the field and Van Zandt held the pass to be valid in that it excluded any negligence. These late 19th century and early 20th century decisions seem fairly favorable to the railroads. I donít know if it has something to do with the country at that stage. I think they had better lawyers then. I donít know how the current Supreme Court would view it if they looked at it. Well, I think thatís where Francis comes in. You had then the Transportation Act of 1940 where, again, Congress had a chance to address this very issue, didnít, and then you had the Francis case. This is the Warren Court. This is ñ well, it wasnít the Warren Court. It was Judge Douglas, Justice Douglas, 1947. Itís the Francis case. And anyway, itís Justice Douglas. Itís not Justice Scalia or Justice Thomas. And again, in Francis, Iíll have to take another look at that because I was focused on Boring, but does it involve upholding this type of condition against a person who wasnít aware of it? It doesnít say one way or the other, yeah. It doesnít really address ñ as far as I know, only Boring addresses that issue. Well, thereís a lower court case, Keyes. Supreme Court. The Supreme Court, Boringís the only one that expressly addresses it. But Justice Douglas, in his opinion in Francis, made it very clear that they were readdressing this issue because of the time that had passed since Adams, Boring, Charleston, and Van Zandt. And they wanted to reexamine this very issue of the validity of these passes. And thatís what they did, and it troubled him. Justice Douglas wrote, were we riding on a clean slate? We may well come to a different conclusion. But the fact that the Supreme Court authority has been so long and so clear, and the fact that Congress has had two chances to change it and didnít do so, made Justice Douglas feel compelled. Justice Black wrote a scathing dissent, and I think there were two other justices who joined him. But Francis is the law of the land. These clauses are still valid, and nothing has changed Boring. But merely by accepting the pass, you have the duty to find out what the conditions are. Itís not a contract. The Boring courtó It was a pass? Yes. Thatís the only way he could be on the train. Otherwise, he didnít get a ticket. He didnít get a ticket. And thatís quite common. And his testimony, which weíd have to accept at the summary judgment stage, was that it was traditional for an employee riding on this kind of a train free to just go to the train station, and then after the employeeís birth, not pick up the ticket. Yes. They all have these passes. They all know they have the passes, and if theyíre not taking a paying passenger seat, they can just get on. Had he gone to the ticket office, thereís a notice posted there saying you ride this only on condition that you waive any negligence. Itís posted in the ticket office. It came with the pass. Itís on the website. It was notóHe did not get a ticket. And itís not written on the pass itself. Itís on the materials that come with the pass. How does the railroad expect people to get home when they have finished a trip? Because they alló Well, I donít think this is as common as counsel made it seem to be. I just asked a question. How did they expect people to get home? Well, he had a truck, and I think they expected him to use his truck to go back to his place in Salt Lake City or drive it to Reno if he wants. He could get there faster in his truck than on the train, but he obviously wanted to sleep and use his free pass. The railroadóThatís a key part of the equation is that the railroad does not tell them. He could take a bus. He could take a plane. He could drive his truck. Okay. Thank you very much. I think I take issue with the notion that the plaintiff knew or had knowledge of the exculpatory clause that supposedly was attached to this pass because at trial, as I recall, the railroad admitted that it didnít know whether this material was ever given to the plaintiff. I think on this record we have toóI thought we had to assume that he did not know. On this recordó I agree. Boring, at least, if itís good law, would say that a person who doesnít know is bound by the conditions of the free pass. Except that there the conditions were provided to the passenger. Here they were not. Not to the wife. Well, the wife, you knowó But the husband got the conditions. And I thought the Supreme Court said she didnít know anything about the conditions. But it was available to her on the ticket. And I think thatís the distinction. You know, if she had said, husband, Iíll carry my own ticket, it would have been available to her. Here the plaintiff had no idea about this exculpatory clause because that material had never been provided to him. And I think thatís the distinction between this case and Boring. Because without knowledge of a condition, how are you supposed to know that youíre supposed to ferret out something that you donít know? And I think thatís the distinction, again, between this case and Boring. I think the hard doctrinal area, at least as I see it, for your side of that point, is that I think the Supreme Court said in Boring that a person doesnít have to have knowledge, that I thinkó No knowledge, no notice? Iíd have to read the case again, too. Iím sorry. I could be wrong in that. But I think tható Returning to the first issue, ìoff dutyî simply in FELA cases does not mean without ñ that youíre outside the scope of employment. The fact that he took his luggage off the train and then returned it, I think, is irrelevant because, according to the record, he took the luggage off the train because the train was not secured and things happened to go missing. The other point I would make is that, yes, he could have been called into service while on that commute in case of an emergency. The record firmly establishes that in an emergency, all rules are suspended. You are expected to go into service. The other thing, he could have driven to his home in the Reno area. I think not, because heíd just come off a 12-hour shift, getting into a truck and making that drive really doesnít make sense when the railroad encouraged ñ encourages their employees and gives them a free pass and so on and says, you know, ìRide at will.î I would hope that the Court would find that this jury instruction is incredibly restrictive for a FELA case. The correct instructions could have been CACI 2926, some combination of badgee or the instructions that were offered in line with Bountiful Brick. If there are no questions, thank you. Thank you, counsel. The case just argued is submitted for decision. That concludes the Courtís calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Rymer, Gould